UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED:___5/1/2024____       │
└─────────────────────────────────┘
```

KAREEM MITCHELL,

                Plaintiff,

       -v.-

WARDEN COOKE, ANNA M. KROSS
CENTER ET AL.,

             Defendants.

23-cv-4348 (LJL)

ORDER

LEWIS J. LIMAN, United States District Judge:

The Court received the attached motion for leave to file a Third Amended Complaint from Plaintiff via mail.  Defendants shall file a letter setting forth their position on Plaintiff's motion by May 15, 2024.

The Clerk of Court is respectfully directed to file the attached motion on the docket under a separate docket number.

Plaintiff is reminded that all papers must be submitted directly to the Pro Se Intake Unit to be filed on ECF.

SO ORDERED.

Dated:   <u>May 1, 2024</u>
        New York, New York

                             LEWIS J. LIMAN
                      United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------

Amended Complaint

Kareem Mitchell,

23- CV - 04348

               Plaintiff

--against--
Warden Cooke, Anna M. Kross Center et al.

              Defendants

----------------------------------------------------

Re: Motion for Leave to File Third Amended Complaint[1]

Dear Judge Liman,

     Plaintiff writes to request leave to amend his Second Amended Complaint, filed March 29, 2024 (ECF 22). In the event that the Court grants leave to amend, Plaintiff requests that the enclosed proposed complaint be deemed Plaintiff's Third Amended Complaint.

     Plaintiff notes that, in response to the court's Valentin order issued on October 18, 2023 (ECF 10), Defense has identified Correctional Officer Jacqueline Hylton as the Jane Doe defendant Plaintiff named in his Amended Complaint (ECF 8). Plaintiff understood the Jane Doe defendant to be a Captain based on the uniform worn by the defendant and believes the Defense may have misidentified the defendant. Jane Doe is the white-shirt captain, about 5'7'' in height, light-skinned black woman with long dreadlocks and glasses who escorted Plaintiff from intake to the 3 Main Housing unit on or about April 21, 2021.

     Plaintiff also notes that the enclosed complaint names two additional defendants and asks that the Court issue an Order of Service on the additional defendants: Correctional Officer Davis, the Correctional Officer at Rikers Island working the floor in AMKC c95 Quad 4 Upper on or about April 25, 2021 and Correctional Officer Guzman, the Correctional Officer at Rikers Island working the floor in AMKC c95 3 Main on April 21, 2021.

Date:

Respectfully Submitted:

PRO SE
Kareem Mitchell
DIN No. 23B2907
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

---

[1] This document was prepared with assistance from the New York Legal Assistance Group's Legal Clinic for Pro Se Litigants in the SDNY.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------

Amended Complaint

Kareem Mitchell,                                           23- CV - 04348
                        Plaintiff

--against--
Warden Cooke, Anna M. Kross Center
Kerly Jean-Louis, Correctional Officer at Anna M. Kross Center
Jane Doe, Captain at Anna M. Kross Center who escorted Plaintiff to 3 Main[1]
CO Davis, Correctional Officer at Anna M. Kross Center
CO Guzman, Correctional Officer at Anna M. Kross Center


                        Defendants


-----------------------------------------------------


## AMENDED COMPLAINT[2]

### I.   INTRODUCTION

1. Plaintiff in the above-caption action alleges as follows
2. Plaintiff brings this action seeking damages pursuant to 42 USC §1983, against the New York City Department of Corrections (hereinafter NYC DOC) employees, executive and administrative staff, Correctional Officers and Correctional Supervisors at Anna M. Kross Center in their individual and official capacity
3. The court has jurisdiction over this action pursuant to 28 USC §§ 1331, 1341(a)(3), 1341(a)(4), a1367(a) and 42 USC §1983
4. Venue is proper in this District pursuant to 28 USC §1391


### II.   PARTIES

5. Plaintiff and was at all times relevant a herein a permanent resident of the United States and resides at:

Kareem Mitchell

DIN No. 23B2907

Clinton Correctional Facility

P.O. Box 2001

---

[1] Defense has identified Jane Doe as Correctional Officer Jacqueline Hylton (Shield #5598). Plaintiff understood this defendant to be a captain, not a Correctional Officer, and therefore believes that the defense may have misidentified the Jane Doe defendant.

[2] This document was prepared with assistance from the New York Legal Assistance Group's Legal Clinic for Pro Se Litigants in the SDNY.

Dannemora, NY 12929

6.   Defendants are as follows, sued in their individual and official capacity:

**WARDEN COOKE**

Warden, Anna M. Kross Center

**KERLY JEAN-LOUIS**

Correctional Officer, Anna M. Kross Center

**JANE DOE**

Captain, Anna M. Kross Center who escorted Plaintiff to 3 Main

**CO DAVIS**

Correctional Officer, Anna M. Kross Center, working the floor in AMKC c95 Quad 4 Upper on or about April 25, 2021.

**CO GUZMAN**

Correctional Officer, Anna M. Kross Center, working the floor in AMKC c95 3 Main on April 21, 2021.

III.   **EXHAUSITON OF ADMINISTRATIVE REMEDIES**

7.   There is a grievance procedure at Anna M. Kross Center, but administrative procedures were unavailable to Plaintiff despite Plaintiff's multiple reasonable attempts to file.
8.   At the time that Plaintiff was attempting to file a grievance as to the events contained herein, he was being housed in the Enhanced Restraint Unit of the North Infirmary Command ("NIC").
9.   Plaintiff was told that a prisoner in the Enhanced Restraint Unit is required to request a grievance form from an officer.
10.  Plaintiff requested a form from the officer on the floor, who told him that officers do not handle grievance forms, and Plaintiff would have to wait until a grievance official came to the unit. Plaintiff was told that person comes around "every so often" because the unit was segregated from other dorms.
11.  About six or seven months later, the grievance official came down to Plaintiff's unit and Plaintiff requested a grievance form.

12. The grievance official asked what the reason for the grievance was and Plaintiff explained his injuries from the events described herein.
13. The grievance official told Plaintiff he would send the form in the mail that day to Plaintiff.
14. Plaintiff never received the form.
15. Plaintiff followed up with the officer on the floor in the unit. The officer told Plaintiff he would once again need to wait for the grievance official to come back around.
16. The grievance official never returned as far as Plaintiff knows, leaving Plaintiff with no knowledge as to whether or how he could further pursue his grievance.

## IV.    STATEMENT OF CLAIM

17. At the time of the events alleged herein, Kareem Mitchell ("Plaintiff") was a prisoner housed at Anna M Kross Center, 1500 Hazen St East Elmhurst New York 11370.
18. On April 21, 2022, Plaintiff was being transferred to a new housing unit. Before his transfer, he was moved to the intake area, where he was assigned to a new housing unit by Defendant Warden Cooke.
19. Before being placed in a housing unit, officers generally ask prisoners whether they have any gang affiliations. Plaintiff told Warden Cooke that he had a preference for placement in AMKC C95 15 Upper ("15 Upper"), where Plaintiff knew others from his neighborhood were housed and where he would be most comfortable.
20. Warden Cooke told him that the "new policy" was that they do not consider gang affiliations when placing prisoners in housing units.
21. Warden Cooke told Plaintiff he would not be placed in 15 Upper, but would instead be placed in AMKC c95 3 Main ("3 Main").
22. Plaintiff told Warden Cooke that he did not want to be in 3 Main because 3 Main was the Los Trinitarios house, a Spanish speaking gang. Plaintiff does not speak Spanish.
23. Plaintiff was afraid to go to 3 Main because he is a Black man and does not speak Spanish. Plaintiff said to Warden Cooke, "they don't like Black people in there." Warden Cooke replied by saying, "you know how to fight, right?"
24. Plaintiff continued arguing that he should not go there in 3 Main until Warden Cooke told him that if he refused to go, she would have him extracted, sprayed, taken to medical, and forcefully placed in the unit.
25. At that point, Plaintiff felt he had no choice but to go to 3 Main.
26. Plaintiff was escorted by a white-shirt captain, Defendant Jane Doe, about 5'7'' in height, light-skinned black woman with long dreadlocks and glasses to the 3 Main housing unit.
27. Upon reaching the dorm entrance, but still located behind the gate, the prisoners housed in the dorm started to yell that he was not welcome because he was not a member or Los Trinitarios and because he did not speak Spanish. Nevertheless, the Jane Doe Captain told Plaintiff to step inside.
28. Plaintiff entered the dorm and dragged his bags to the back of the unit, where there was an empty bed.
29. Prisoners in the dorm approached, asking whether he spoke Spanish and whether he was in the gang.
30. Plaintiff went to wait in line for the bathroom, where he was told by another prisoner to "mind his goddamn business and sit down."
31. At that point, Plaintiff was surrounded and assaulted by about six prisoners. Plaintiff was stabbed 3 or 4 times in his leg and side and lacerated deeply on his back. He was also jump-kicked and punched repeatedly by numerous assailants.

32. CO Guzman was the officer on the floor at the time. He was armed with pepper spray and responsible for monitoring the floor and intervening to stop any fights that broke out.

33. CO Guzman did not intervene in any way when the assault began. He turned the other direction and walked away.

34. The fight was ongoing for about 5 minutes, at which point, on information and belief, the panic button was pressed and the emergency unit arrived, at which point Plaintiff's assailants ceased their assault and emergency unit assessed Plaintiff's injuries.

35. NYC DOC policy requires prison staff to document incidents resulting in injuries by taking photographs. Warden Cooke was the staff member photographing Plaintiff's injuries after this incident.

36. While Warden Cooke was photographing the Plaintiff, Plaintiff asked, "is this going to keep on happening?" In response, Warden Cooke smiled and said nothing.

37. The emergency unit determined that Plaintiff's injuries were severe enough to require outside medical treatment, so they brought Plaintiff to Bellevue Hospital where he received stitches and treatment for his deep stab wounds.

38. On or about April 23, 2022 Plaintiff returned to Anna M. Kross Center from Bellevue and was placed back in intake, where he remained for 1-2 nights.

39. The intake unit has no running water, and no bed to sleep on. Plaintiff slept on either the cement floor or the cement bench in the intake cell.

40. Because of his injuries, Plaintiff was told by Warden Cooke that policy allows for Plaintiff to spend some amount of time in the Involuntary Protective Custody Unit ("IPC") at the NIC.

41. Plaintiff understood the IPC to also be a gang affiliated unit, and so asked Warden Cooke about who is living in the unit out of concern for his safety. She told him that she "only sees prisoners."

42. Based on interactions with staff, Plaintiff understands that all prison staff, including Warden Cooke, had knowledge of which gang affiliations existed in each dorm. Plaintiff has on previous occasions been escorted by numerous Correctional Officers who explicitly stated the gangs that were affiliated with each of the dorms they passed.

43. Because he was not told who was housed in the IPC, Plaintiff was concerned that gang affiliated prisoners housed in the IPC might harm him. Given his concern, Plaintiff opted out of placement in the IPC and again expressed a desire to be placed in 15 Upper.

44. Plaintiff was told by Warden Cooke that he would be placed in AMKC c95 Quad 4 Upper ("Quad 4 Upper").

45. Warden Cooke did not tell Plaintiff who was housed in Quad 4 Upper, but COs told Plaintiff that the unit was a Mac Ballers housing unit.

46. On April 23, 2022, Plaintiff was transferred to Quad 4 Upper. CO Jean-Louis was working the bubble in Quad 4 Upper, and CO Davis was working the floor.

47. Plaintiff was escorted in the morning by a security officer to the unit. When he got to the gate, the prisoners in the unit told CO Jean-Louis and CO Davis that Plaintiff "ain't coming in here. This is a Mac Baller house."

48. CO Jean-Louis ordered Plaintiff into the unit anyway and directed him to place his bags in the cell at the very back of the unit.

49. The unit is a long narrow corridor. The day room is located in the front of the unit and the cells extend toward the back of the unit. There is only one way in and out of the unit.

50. Plaintiff entered the unit, put his bags in the cell at the very back of the unit, and returned to the day room in the front of the unit to place a phone call.

51. Plaintiff was on the phone for about ten minutes. During this time, the tier lights were turned off. Only COs and staff have control over the tier lights because the switches are located inside the

bubble. Plaintiff saw CO Jean Louis walking with one of the prisoners in the dorm shortly before the lights were turned out.

52. CO Jean-Louis was later penalized by the prison for the lights being out when they should not have been.

53. Once the lights were turned off, Plaintiff was struck with a cane by another prisoner in the dayroom. Other prisoners subsequently joined in the assault, punching, kicking, and beating Plaintiff with canes. Other prisoners began rushing from the back of the unit into the day room, and Plaintiff believed they intended to also join in the assault.

54. Plaintiff attempted to escape the day room and exit through the front of the unit.

55. CO Davis sprayed pepper spray throughout the front of the unit, attempting to push Plaintiff toward the back of the unit where Plaintiff's assailants were.

56. Plaintiff could not return to the back of the unit or else he would have continued to be beaten. Plaintiff ran through the pepper spray in an attempt to get to the gate.

57. After about 5 minutes, on information and belief the panic button was pressed, and the fight ended when security guards came to break up the fight.

58. Plaintiff was taken to the decontamination pen to clean his eyes of pepper spray and then was taken to medical for treatment of the laceration above his eye.

59. Plaintiff was then taken to intake, where he spent about five days. On information and belief NYC DOC Policy disallows prisoners from being held for more than a day in the intake unit.

60. Plaintiff suffered bruising, swelling and lacerations from the assault.

61. Upon returning to intake, Warden Cooke took photographs of Plaintiff's new injuries.

62. Plaintiff said to Warden Cooke, "this keeps happening," to which Warden Cooke said nothing, but smiled.

63. As a result of the two incidents, Plaintiff's custody level was increased and he was moved to the enhanced restraint unit of the NIC, where he spent about a year.

## **RELIEF**

64. Plaintiff demands **A TRIAL BY JURY**

65. Plaintiff asks for the following relief
    a. $75,000 in Compensatory Damages
    b. $75,000 in Punitive Damages

I, Kareem Mitchell, declare under the penalty of perjury that the foregoing is true and correct


Date:


Respectfully submitted


_____

Plaintiff Pro Se