UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/15/2025
```

-------------------------------------------------------------------X
                               :

KAREEM MITCHELL,                   :

                         :

               Plaintiff,    :                  23-cv-04348 (LJL)

                         :

        -v-                  :        OPINION AND ORDER

                         :

WARDEN COOKE, et al.,        :

                         :

            Defendants.    :

                         :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

On May 24, 2023, *pro se* Plaintiff Kareem Mitchell ("Plaintiff") brought suit against the leadership of the New York City Department of Correction ("NYCDOC") for injuries that he suffered while detained on Rikers Island.  Dkt. No. 1.[1]

Defendants Warden Cooke ("Cooke"), Correctional Officer Kerly Jean-Louis ("Jean-Louis"), Captain La Shonda Stanley ("Stanley"), Correctional Officer Davis ("Davis"), and Correctional Officer Guzman ("Guzman," and collectively "Defendants") move, pursuant to Federal Rules of Civil Procedure 12(b)(6), to dismiss Mitchell's Third Amended Complaint for failure to state a claim for relief.  Dkt. No. 44.

For the following reasons, the motion to dismiss is granted with respect to Stanley and Jean-Louis, and denied with respect to Cooke, Guzman, and Davis.  Plaintiff is given leave to file an amended complaint not later than November 17, 2025.

---

[1] Plaintiff filed his original and subsequent amended complaints *pro se*.  Since the filing of the Third Amended Complaint, the law firm Covington & Burling LLP entered a limited appearance as pro bono counsel for the purpose of responding to Defendants' motion to dismiss and related depositions.  *See* Dkt. Nos. 50–51.  The Court thanks Covington & Burling LLP for its service to the Court.

**BACKGROUND**

Plaintiff's complaint sets forth two specific incidents during which his constitutional rights were allegedly violated, both of which occurred while he was incarcerated at Anna M. Kross Center ("AMKC"), a jail on Rikers Island. Dkt. No. 43 ("Third Amended Complaint" or "TAC") ¶ 17.

The first incident took place on April 21, 2022. *Id.* ¶ 18. AMKC was transferring Plaintiff to a new housing unit within the facility. *Id.* Before his transfer, Plaintiff was moved to the "intake area," where Cooke, a warden at AMKC, was meant to assign Plaintiff to his new unit. *Id.* Plaintiff informed Cooke that, of the housing units within AMKC, he preferred to be placed in AMKC C95 15 Upper ("15 Upper"), a housing unit where other people in custody from Plaintiff's neighborhood were housed and where Plaintiff thought he would be most comfortable. *Id.* ¶ 19. Cooke informed Plaintiff that, as a new policy, "they do not consider gang affiliations when placing prisoners in housing units." *Id.* ¶ 20. Cooke then told Plaintiff that instead of 15 Upper, Plaintiff would be placed in AMKC C95 3 Main ("3 Main"). *Id.* ¶ 21. Plaintiff did not want to be assigned to 3 Main because it was the primary housing unit for the Los Trinitarios gang, a "Spanish-speaking gang"—Plaintiff does not speak Spanish and was also afraid of transferring to 3 Main "because he is a black man." *Id.* ¶¶ 22, 23. Plaintiff told Cooke he did not want to be assigned to 3 Main and that "they don't like black people in there." *Id.* Cooke replied to Plaintiff, "[Y]ou know how to fight, right?" *Id.* ¶ 23. Plaintiff continued arguing with Cooke about his assignment to 3 Main, at which point Cooke told Plaintiff that if he refused to voluntarily comply with his housing assignment, Cooke would have him "extracted, sprayed, taken to medical, and forcefully placed" in his housing unit. *Id.* ¶ 24. Upon hearing this, Plaintiff felt he had no choice but to go to 3 Main. *Id.* ¶ 25.

Stanley, a captain at AMKC, escorted Plaintiff to the 3 Main housing unit. *Id.* ¶ 26. When Stanley and Plaintiff reached the entrance to 3 Main, people in custody behind the dormitory gate began yelling that Plaintiff was not welcome in 3 Main because Plaintiff was not a member of Los Trinitarios and Plaintiff did not speak Spanish. *Id.* ¶ 27. Stanley ordered Plaintiff to enter the unit anyway, and Plaintiff deposited his bags at an empty bed in the back of the unit. *Id.* Other inmates within the dorm quickly approached Plaintiff, asking him whether he spoke Spanish and whether he was in a gang. *Id.* ¶ 20. Plaintiff then went to wait in line for the bathroom, where another inmate told him to "mind his goddamn business and sit down." *Id.* ¶ 30. Six inmates in the dorm then surrounded and physically assaulted Plaintiff, stabbing him three or four times in his leg and his side and deeply lacerating his back. *Id.* ¶ 31. Numerous others in the unit also repeatedly jump-kicked and punched Plaintiff. *Id.*

Guzman was the correctional officer at AMKC assigned to the floor during the 3 Main residents' assault on Plaintiff, meaning he was responsible for monitoring the floor and intervening to stop any fights that broke out between inmates. *Id.* ¶ 32. Yet, when the assault began, Guzman did not intervene in the assault in any way; instead, Guzman turned the other direction and walked away. *Id.* ¶ 33. After the fight went on for about five minutes, Plaintiff alleges, on information and belief, that someone pressed "the panic button." *Id.* ¶ 34. The emergency unit arrived at the scene, at which point the inmates stopped assaulting Plaintiff and the emergency unit assessed Plaintiff's injuries. *Id.* NYCDOC requires correctional staff to document injury-causing incidents by taking photographs of inmates' injuries, and Cooke was the staff member responsible for photographing Plaintiff's injuries following the assault. *Id.* ¶ 35. While Cooke was taking pictures of Plaintiff's injuries, Plaintiff asked Cooke, "Is this going to keep on happening?" *Id.* ¶ 36. In response, Cooke "smiled and said nothing." *Id.* The

emergency unit subsequently determined Plaintiff's injuries were severe enough to warrant medical treatment from outside the jail, so they transported Plaintiff to Bellevue Hospital in Manhattan, where Plaintiff received stitches and other medical treatment for the wounds he incurred from the assault. *Id.* ¶ 37.

The second incident took place on April 23, 2022. *Id.* ¶ 46. Sometime after the first incident on April 21, 2022, but prior to April 23, 2022, Plaintiff returned from Bellevue to AKMC, where he was placed back in the intake room. *Id.* ¶ 38. The intake room had no running water, nor any bed to sleep on; for the next one to two nights, while recovering from his injuries, Plaintiff slept on either the room's cement floor or on a cement bench. *Id.* ¶ 39. Cooke informed Plaintiff that, due to his injuries, Plaintiff was permitted a stay in the Involuntary Protective Custody Unit ("IPC") at the North Infirmary Command ("NIC"). *Id.* ¶¶ 7, 39. Plaintiff understood IPC to be a gang-affiliated unit but when, out of concern for his own safety, Plaintiff asked Cooke about who lived in the unit, Cooke responded that she "only sees prisoners," implying that she did not recognize those who were assigned to units based on their gang affiliation. *Id.* ¶ 41. However, based on his interactions with staff, Plaintiff alleges that all jail staff, including Defendants, knew which gangs were affiliated with each dormitory of AMKC. *Id.* ¶ 42. For example, during Plaintiff's previous escorts through AMKC, numerous correctional officers explicitly stated to Plaintiff the gangs affiliated with dorms they passed during the escort. *Id.* Therefore, Cooke's uninformative response as to the gang-affiliations within IPC made Plaintiff further concerned that gang-affiliated people housed in IPC might harm him, which led him to opt out of placement in IPC. *Id.* ¶ 43. Plaintiff again expressed a desire to be placed in 15 Upper, but Cooke told Plaintiff that he would be placed in another housing unit, AMKC C95 Quad 4 Upper ("Quad 4 Upper"). *Id.* ¶¶ 43, 44. Cooke did not inform Plaintiff

about the composition of Quad 4 Upper, but other correctional officers later told Plaintiff that Quad 4 Upper was affiliated with the "Mac Ballers" gang. *Id.* ¶ 45.

During the morning of April 23, 2022, a security officer escorted Plaintiff to Quad 4 Upper. *Id.* ¶ 47. Jean-Louis, a correctional officer, was "working the bubble," which the Court infers is the unit's control center,[2] in Quad 4 Upper that day, and Davis, another correctional officer, was assigned to the floor. *Id.* ¶ 46. When Plaintiff arrived at the entrance of the unit, the unit residents told Jean-Louis and Davis that Plaintiff "ain't coming in here" because "[t]his is a Mac Baller house." *Id.* ¶ 47. Despite these comments, Jean-Louis ordered Plaintiff into the unit and directed him to place his bags in a cell at the very back of the housing unit. *Id.* ¶ 48. Quad 4 Upper is a long, narrow corridor: the day room is located in the front of the unit, and cells extend toward the back, with only one way in and out. *Id.* ¶ 49. Plaintiff entered the unit, placed his bags in his new cell, and returned to the day room (at the front of the unit) to place a phone call. *Id.* ¶ 50. During Plaintiff's phone call, which lasted around ten minutes, the tier lights were turned off. *Id.* ¶ 51. However, shortly before the lights were turned off, Plaintiff saw Jean-Louis walk into the dorm with one of the inmates. *Id.* Since the switches for lights are located inside "the bubble," only correctional officers and staff have control over the tier lights. *Id.* Plaintiff alleges that Jean-Louis was later penalized by the jail for "the lights being out when they should not have been." *Id.* ¶ 52. Once the lights were turned off, while Plaintiff was still in the day room, another inmate in the dorm struck Plaintiff with a cane. *Id.* ¶ 53. Other inmates joined the assault on Plaintiff and punched, kicked, and beat Plaintiff with canes. *Id.* Several other inmates began rushing from the back of the unit into the day room; Plaintiff believed that they too

---

[2] *See Hemric v. City of N.Y.*, 2001 WL 118561, at *1 (S.D.N.Y. Feb. 13, 2001) (stating that the bubble is the central command area on the tier).

intended to join the assault. *Id.* Plaintiff attempted to escape the day room and exit through the front of the unit. *Id.* ¶ 54. However, Davis pepper-sprayed the area throughout the front of the unit; Plaintiff alleges that Davis was "attempting to push Plaintiff toward the back of the unit where Plaintiff's assailants were." *Id.* ¶ 55. Plaintiff instead chose to run through the pepper spray in an attempt to get to the gate because Plaintiff believed he would have continued to be beaten if he returned to the back of the unit. *Id.* ¶ 56. Plaintiff alleges, on information and belief, that after about five minutes, someone pressed the panic button; security guards arrived to break up the fight, at which point the fighting ceased. *Id.* ¶ 57. Plaintiff suffered bruising, swelling, and lacerations from the assault. *Id.* ¶ 60.

Plaintiff was subsequently taken to the decontamination pen to clean his eyes of pepper spray and then taken to the medical unit for treatment of a laceration above his eye. *Id.* ¶ 58. Plaintiff was then taken back to the intake room, where he spent about five days, even though the NYCDOC allegedly disallows correctional facilities from holding inmates in the intake unit for more than one day. *Id.* ¶ 59. While Plaintiff was being held in the intake unit, Cooke took photographs of Plaintiff's new injuries. *Id.* ¶ 61. Plaintiff told Cooke, "[T]his keeps happening." *Id.* ¶ 62. In response, Cooke smiled and said nothing. *Id.*

As a result of the two incidents, AMKC increased Plaintiff's custody level and moved him to the Enhanced Restraint Unit ("ERU") of the Northern Infirmary Command ("NIC") for about a year. *Id.* ¶ 63.

Plaintiff additionally pleads that while he attempted to file a grievance at AMKC on multiple occasions, administrative procedures to bring his current Section 1983 claims were "unavailable" to him. *Id.* ¶ 7. Plaintiff attempted to file a grievance concerning the two incidents described within the TAC when Plaintiff was housed in the ERU of the NIC. *Id.* ¶ 8.

Plaintiff was initially told that an inmate being held in the ERU must request a grievance form from an officer. *Id.* ¶ 9. Plaintiff then requested a form from the officer on the floor. *Id.* ¶ 20. That officer told Plaintiff that correctional officers do not handle grievance forms and that Plaintiff would have to wait until a grievance official came to the unit, which happened only "every so often" because ERU is segregated from other housing units. *Id.* ¶ 10. About six or seven months later, the grievance official finally visited Plaintiff's unit and, adhering to the procedure described by the officer on the floor, Plaintiff requested a grievance form. *Id.* ¶ 11. When the official asked what the reason for the grievance was, Plaintiff described the above events. *Id.* ¶¶ 11, 12. In response, the grievance official told Plaintiff he would send the form in the mail that day to Plaintiff. *Id.* ¶ 13. But Plaintiff never received the form. *Id.* ¶ 14. Plaintiff eventually followed up with the officer on the floor in the ERU about the form, but the officer told Plaintiff that he would once again need to wait for the grievance official to come back to the unit. *Id.* ¶ 15. As far as Plaintiff knows, the grievance official never returned, leaving Plaintiff in the dark as to whether or how he could further pursue his grievance pursuant to the grievance procedures at AMKC. *Id.* ¶ 16.

## PROCEDURAL HISTORY

Plaintiff filed this case on May 24, 2023. Dkt. No. 1. Plaintiff asserted a claim challenging the constitutionality of the conditions of his confinement under 42 U.S.C. § 1983. *Id.*; *see also* Dkt. No. 45-1. Plaintiff initially named the City of New York, Louis Molina, Lynelle Liddie, Lynelle Maginley, and Kat Thomson. Dkt No. 1.[3] Plaintiff was granted leave to file an amended complaint on August 22, 2023. Dkt. No. 5. Plaintiff subsequently filed an amended complaint on October 12, 2023. Dkt No. 8. Plaintiff named the City of New York, the

---

[3] These individuals were all alleged to be in leadership roles at NYCDOC, rather than being personally involved in the events of the complaint.

Warden of AMKC (C–95), Deputy Warden Cook (Female), John Doe, and John Doe #2. *Id.*; *see also* Dkt. No. 45-2. After Defendants filed a letter-motion providing the identities of the "two John Doe individuals named in the complaint," Dkt. No. 20 at 2, the Court granted Plaintiff leave to file the Second Amended Complaint identifying the John Does on October 17, 2023. Dkt. No. 21. The Court received the Second Amended Complaint by mail on March 29, 2024. Dkt. No. 22. Plaintiff named the City of New York, Warden Cook (Female), John Doe, and the Warden of AMKC (C–95). *Id.* Defendant City of New York filed a motion to dismiss Plaintiff's Second Amended Complaint on April 29, 2024, with a memorandum of law and declaration from counsel in support of the motion. Dkt. Nos. 23–25. Plaintiff filed a motion for leave to amend, received by the Court on May 1, 2024. Dkt. No. 28. Plaintiff was granted leave to file a Third Amended Complaint on May 16, 2024. Dkt. No. 30. Plaintiff filed the Third Amended Complaint on December 6, 2024, naming Cooke, Jean-Louis, Stanley, Davis, and Guzman. Dkt. No. 43.[4] Defendants jointly filed a Motion to Dismiss on January 17, 2025, with a memorandum of law and declaration by counsel in support of the motion. Dkt. Nos. 44–46. Plaintiff filed a memorandum of law in opposition to the motion to dismiss on April 16, 2025. Dkt. No. 54. Defendants filed a reply memorandum of law in further support of their motion on April 30, 2025. Dkt. No. 55.

## LEGAL STANDARD

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept the material facts as alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (quoting *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994)). However, "[t]o survive a motion to dismiss, a

---

[4] The docket entry at Dkt. No. 43 calls Plaintiff's pleading a "Fourth Amended Complaint." In fact, it is a Third Amended Complaint.

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

The Court construes *pro se* pleadings broadly and liberally, interpreting them to raise the strongest arguments they suggest.  *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000).  This obligation "is especially true when dealing with *pro se* complaints alleging civil rights violations." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 (2d Cir. 2002); *see also Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001).  That solicitude does not relieve *pro se* plaintiffs of the requirement that they plead enough facts to "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  Nor does it relieve them of the obligation to otherwise comply with the pleading standards set forth by the Federal Rules of Civil Procedure.  *See Saidin v. N.Y.C. Dep't of Educ.*, 498 F. Supp. 2d 683, 687 (S.D.N.Y. 2007) ("[P]ro se status does not relieve a plaintiff of the pleading standards otherwise prescribed by the Federal Rules of Civil Procedure."); *see also Locicero v. O'Connell*, 419 F. Supp. 2d 521, 525 (S.D.N.Y. 2006) (requiring that *pro se* litigants allege sufficient facts to indicate deprivation of a constitutional right).

**DISCUSSION**

## I.  Administrative Exhaustion

Defendants argue that Plaintiff has not fulfilled his administrative exhaustion obligation as set forth under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and that Plaintiff did not take "reasonable efforts" to satisfy that obligation.  Dkt. No. 46 at 6–8.

An incarcerated person bringing an action under 42 U.S.C. § 1983 must first fulfill the administrative exhaustion requirements set forth by the PLRA.  Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006).  The administrative requirements of the correctional institution in which a plaintiff is being held set the boundaries of exhaustion, not the PLRA.  *See Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Romano v. Ulrich*, 49 F.4th 148, 153 (2d Cir. 2022).

However, prisoners need not exhaust administrative remedies when those remedies are "unavailable."  *Ross v. Blake*, 578 U.S. 632, 642 (2016).  An administrative procedure may be unavailable when (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Williams v. Priatno*, 829 F.3d 118, 123–24 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 643–44).  These three circumstances are instructive, but "not 'exhaustive.'"  *Romano*, 49 F.4th

at 155 (quoting *Rucker v. Giffen*, 997 F.3d 88, 93 (2d Cir. 2021)); *see also Williams*, 829 F.3d at 123 n.2 (observing that "the three circumstances discussed in *Ross* do not appear to be exhaustive"). "The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Lucente v. County of Suffolk*, 980 F.3d 284, 311–12 (2d Cir. 2020) (quoting *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004), *abrogated on other grounds by Ross*, 578 U.S. at 641); *see also Baltas v. Maiga*, 119 F.4th 255, 267 (2d Cir. 2024). Determining whether a grievance procedure is effectively unavailable to a plaintiff is "often [a] complex and highly fact-specific inquir[y]," *Hayes v. Dahlke*, 976 F.3d 259, 268 (2d Cir. 2020), in which a court must look to the "real-world workings of prison grievance systems" to discern whether procedures were capable of use by a given plaintiff to obtain relief. *Ross*, 578 U.S. at 643.

Failure to exhaust is an affirmative defense under the PLRA. Plaintiffs "are not required to specifically plead or demonstrate exhaustion in their complaints," nor are they required to plead the availability (or unavailability) of administrative remedies. *Jones*, 549 U.S. at 216–17; *see Genoa v. City of New York*, 2021 WL 2111817, at *3 (S.D.N.Y. May 25, 2021) (stating that a plaintiff's failure to plead administrative exhaustion was not grounds for dismissal pursuant to Rule 12(b)(6)). However, "a district court still may dismiss a complaint for failure to exhaust" pursuant to Rule 12(b)(6) where that failure is clear, as a matter of law, "on the face of the complaint." *Williams*, 829 F.3d at 122; *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) . . . if the defense appears on the face of the complaint.").

Plaintiff does not dispute that he failed to fulfill the grievance procedures as dictated by NYCDOC's regulations. Plaintiff affirmatively pleads that he did not submit a grievance form. TAC ¶ 7; *see Cary v. City of New York*, 2018 WL 1581988, at *3 (S.D.N.Y. Mar. 27, 2018) (outlining the grievance process within the New York City Department of Correction). He contends instead that the grievance procedures were not available to him within the meaning of *Ross* and its progeny. Plaintiff argues that his failure to exhaust is excused because (1) the grievance procedure was a "simple dead end" for him, Dkt. No. 54 at 6; (2) "the grievance process was so opaque as to be incapable of use," *id.*; and (3) his attempts to pursue an administrative remedy were obstructed when the jail officials affirmatively mislead him as to the procedures in the ERU of the NIC, *id.*

Ordinarily, the question of whether the plaintiff has exhausted administrative remedies is addressed at the summary judgment stage. *See, e.g.*, *Khudan v. Lee*, 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (stating that "failure to exhaust is an affirmative defense that . . . is properly reserved for a motion for summary judgment"). However, where it is apparent on the face of the complaint that a grievance process exists and is applicable but has not been exhausted, the plaintiff bears the burden of sufficiently pleading that administrative remedies were not available to him.[5] The standard is similar to that when a claim appears from the face of a complaint to be untimely. *See Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (holding

---

[5] Failure to exhaust may, for instance, be apparent on the face of the complaint where the time elapsed between the incidents underlying the prisoner's claims and the filing of the operative complaint is too short to have permitted the plaintiff to exhaust the grievance process. *See Howard v. Brown*, 2018 WL 3611986, at *2–3 (S.D.N.Y. July 26, 2018); *Cary*, 2018 WL 1581988, at *3; *Price v. City of New York*, 2012 WL 3798227, at *3 (S.D.N.Y. Aug. 30, 2012). In such circumstances, the court may take judicial notice of the regulations of the relevant correctional system setting forth processes for pursuing administrative remedies. *See Baltas*, 119 F.4th at 265 n.4; *Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972).

that a plaintiff must affirmatively plead exceptions to statute of limitations where a claim otherwise appears untimely on its face).  That proposition follows from the fact that it is the inmate and not the defendant who has the burden to establish "*de facto* unavailability" of a grievance policy that "theoretically exists and applies." *Saeli v. Chautauqua County*, 36 F.4th 445, 453 (2d Cir. 2022).  The Court is permitted to dismiss a complaint "[w]here it appears from the face of the complaint that a plaintiff concedes lack of exhaustion, or nonexhaustion is otherwise apparent," and the plaintiff offers no excuse for his failure to follow an administrative exhaustion requirement.  *See Thomas v. Metro. Corr. Ctr.*, 2010 WL 2507041, at *7 (S.D.N.Y. June 21, 2010).  The Court is not required to guess or assume that an otherwise applicable policy was not available to the plaintiff.  *See Ortiz v. City of New York*, 2025 WL 936701, at *3 (S.D.N.Y. Mar. 27, 2025) (dismissing complaint where it was clear that the plaintiff had failed to exhaust and no allegations were made regarding unavailability).  However, the Court still construes pleadings regarding unavailability generously to *pro se* plaintiffs, construing allegations of unavailability broadly and liberally, interpreting them to raise the strongest arguments they suggest.  *See Phelps*, 308 F.3d at 184 (on motion to dismiss); *Abbas v. Dixon*, 480 F.3d at 639 (on *pro se* pleadings); *Simmons v. Cripps*, 2013 WL 1290268, at *9 (S.D.N.Y. Feb. 15, 2013) ("Plaintiff . . . alleges that, although he filed no appeal of his unanswered grievances, he exhausted 'all known remedies.' . . . [T]his Court construes Plaintiff's allegations liberally and concludes that he may have intended to convey that he did exhaust his claims, or that, if he failed to do so, as Defendants contend, he may have had an excuse for that failure." (citations omitted)), *report and recommendation adopted*, 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013).[6]

---

[6] Courts in this District have not always been clear as to the requirements of a prisoner to plead

Particularly given the solicitude owed to *pro se* litigants, Plaintiff has plead sufficient facts on the face of his complaint to demonstrate that otherwise applicable grievance procedures were unavailable in practice.  Plaintiff affirmatively alleges that he made "multiple reasonable attempts to file a grievance."  Dkt. No. 28 ¶ 7.  He further alleges that at the time he made those attempts, he was housed in the ERU of the NIC and that he was told by a person with authority that an inmate in that unit had to request a grievance form from a grievance official.  *Id.* ¶¶ 8–9. When he requested a form from the officer on the floor, he was told that officers do not handle grievance forms and that he would have to wait until a grievance official came to the unit.  *Id.* ¶ 10.  He alleges that he was told that the grievance official came to the unit "every so often" because the unit was segregated from other dorms.  *Id.* ¶ 10.  Plaintiff requested a grievance form when a grievance official came to Plaintiff's unit, and he was promised a form that was never sent.  *Id.* ¶¶ 11–14.  When Plaintiff followed up with the officer on the floor, he was once again told that he would need to wait for the return of the grievance official.  *Id.* ¶ 15.  However, the grievance official never returned, leaving Plaintiff no avenues with which to pursue his grievance.  *Id.* ¶ 16.

---

the practical unavailability of a policy that is on its face applicable.  Some courts frame the question as to whether an exception to exhaustion "may well be applicable."  *See, e.g., Wing v. Myers*, 2019 WL 6732967, at *5 (S.D.N.Y. Dec. 11, 2019) (quoting *McIntosh v. United States*, 2016 WL 1274585, at *13 n.15 (S.D.N.Y. 2016)).  Others articulate the question as whether there is an "indication—or suggestion" that the prison inhibited the exhaustion of remedies.  *See Astrobus v Warden OF GRVC*, 2012 WL 1900542, at *3 (S.D.N.Y. May 25, 2012).  Others appear to require more extensive pleading.  *See Sheng-Wen Cheng v. United States*, 725 F.Supp.3d 432, 441–442 (S.D.N.Y. 2024).  Such ambiguity may stem from the fact that the foregoing cases all arise from *pro se* suits, where the court's solicitude for *pro se* plaintiffs may be read as lightening the plaintiff's burden with respect to exhaustion.  Nonetheless, the Court concludes that where it is apparent on the face of the pleadings that an otherwise applicable grievance process has not been exhausted, the plaintiff bears the burden of sufficiently pleading that administrative remedies were not available to him.

Plaintiff's allegations suggest one or more bases on which grievance procedures were not available to Plaintiff.  First, Plaintiff plausibly alleges that correctional officers in the ERU thwarted him from taking advantage of the grievance process by affirmatively misleading him as to how to pursue administrative remedies.  To render a procedure unavailable under this prong, a plaintiff must show that a prison administrator interfered with the plaintiff's pursuit of relief through "machination, misrepresentation, or intimidation," to such an extent that the grievance process was no longer capable of use to obtain relief.  *Ross*, 578 U.S. at 644.  Although the Second Circuit has not directly defined a plaintiff's burden for showing whether an administrator thwarted the incarcerated person's ability to pursue administrative relief through "misrepresentation" under *Ross*,[7] the Circuit's approach to defining a plaintiff's burden for proving "intimidation" is instructive.  *See Lucente*, 980 F.3d at 312–13; *see also Baltas*, 119 F.4th at 267.  The Second Circuit held in *Baltas* that a plaintiff's burden flows from the overarching objective standard for demonstrating unavailability: "[t]o determine whether a grievance process has been rendered 'unavailable' through 'threats or intimidation by prison officials,' we consider whether the intimidating acts 'would have deterred a similarly situated individual of ordinary firmness from utilizing the grievance procedures.'"  119 F.4th at 267 (quoting *Lucente*, 980 F.3d at 312–13).  The court stated that "the availability inquiry uses an objective standard rather than a standard that explores the plaintiff's subjective fears of harm." *Id.* at 268.  *Baltas* further held that the intimidation must occur "in connection with the grievance

---

[7] Prior to *Ross*, the Second Circuit held in *Brownell v. Krom* that where prison officials gave a plaintiff misleading advice on how to prosecute the necessary grievance process for his claim, the plaintiff had sufficiently shown a "special circumstance[] justifying noncompliance with the exhaustion requirements of the PLRA."  446 F.3d 305, 313 (2d Cir. 2006).

process itself," and that a "generalized fear of retaliation" is "insufficient as a matter of law to support a finding that the grievance process was unavailable." *Id.*

Under *Ross*, a misrepresentation renders an otherwise applicable grievance process unavailable when it misleads "inmates so as to prevent their use of otherwise proper procedures." *Ross*, 578 U.S. at 644.  The question thus is not whether the misrepresentation is "clear" but whether its effect would be to interfere with the inmate's pursuit of relief. *Hardy v. Shaikh*, 959 F.3d 578, 586 (3d Cir. 2020) (citing cases).  The salutary purposes of the PLRA exhaustion requirement "cannot be realized unless the grievance process to be exhausted is actually available to inmates and faithfully followed by prisons," which requires that administrative remedies be reasonably communicated to prisoners. *Id.*  It is therefore "imperative that prisons refrain from not only clear misrepresentations, but also misleading statements." *Id.* at 587.  A statement is misleading when it is "of the sort that a reasonable inmate would be 'entitled to rely on,' even though it is 'at odds with the wording' of the grievance process." *Id.* at 588 (citation omitted).[8]  Plaintiff has plausibly alleged that both the officer on the floor in the ERU and the grievance official with whom Plaintiff spoke while in the ERU thwarted his ability to pursue administrative remedies through misrepresentation.  The officer on the floor insisted that officers "do not handle grievance forms" and that Plaintiff could only obtain such a form from a grievance official who only came "every so often" because the unit was "segregated from other dorms." TAC ¶¶ 9–10.  Following months of waiting, the grievance official visited Plaintiff in the ERU and, upon hearing about the incidents described by Plaintiff, told Plaintiff that he would

---

[8] The Third Circuit also requires the plaintiff to show that he relied on the misrepresentation to his detriment. *Id.* at 588.  The Court does not need to determine whether a similar showing must be made in this Circuit; regardless, Plaintiff's allegations demonstrate that he relied to his detriment on Defendants' misleading statements.

"send the form in the mail that day to Plaintiff." *Id.* ¶ 13. But the grievance official seemingly never did so. *Id.* ¶ 14. Plaintiff was then left to ask the officer on the floor again, to which he received the same response—that he would "need to wait for the grievance official to come back around." *Id.* ¶ 15.

This case thus falls outside of the line of cases relied upon by Defendants, which hold that a failure by a single jail administrator to provide a form to the plaintiff is insufficient to show that administrative remedies were unavailable. *See, e.g., Sheng-Wen Cheng*, 725 F. Supp. 3d at 441–42; *Armand v. Simonson*, 2016 WL 1257972, at *22 (S.D.N.Y. Mar. 30, 2016).[9] Such circumstances do not satisfy the "ordinary firmness" standard. In this case, however, an officer explicitly told Plaintiff that he would not be able to receive a grievance form from any officer, leading him to believe that any further requests would be futile until a grievance official visited the unit. TAC ¶ 9. Then, when the grievance official arrived on the scene, nothing was done to cure what Defendants now suggest was Plaintiff's misunderstanding. *Id.* ¶¶ 11–13. The

---

[9] Defendants expressly argue, based on these cases and others, that Plaintiff has not made "reasonable efforts" to fulfill his exhaustion obligation under the PLRA. *See Silvagnoli v. Figueroa*, 2014 WL 4160213, at *4 (S.D.N.Y. Aug. 19, 2014); *Indelicato v. Suarez*, 207 F. Supp. 2d 216, 219–20 (S.D.N.Y. 2002). But the question posed in *Silvagnoli* and *Indelicato* was framed in terms of pre-*Ross* precedent, wherein the Second Circuit allowed significant efforts by an incarcerated plaintiff to constitute a "special circumstance" sufficient to excuse failure to follow administrative remedies. *See, e.g.*, *Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004). *Ross* abrogated that line of analysis, holding that there were no "special circumstances" exceptions to PLRA exhaustion. *Ross*, 578 U.S. at 641. Even so, all of Defendants' cases, pre- and post-*Ross*, are factually distinguishable from the present case. In those cases, the communications at issue would not have deterred a similarly situated inmate of "ordinary firmness" from using the grievance procedures. *See Indelicato*, 207 F. Supp. 2d at 219–20 (plaintiff had additional time to request a form from another available officer before expiration of his administrative claim); *Silvagnoli*, 2014 WL 4160213, at *4 (after one officer's refusal, plaintiff chose not to speak to other available officers); *Armand*, 2016 WL 1257972, at *2 (failure by a single administrator to provide a form was insufficient for unavailability); *Sheng-Wen Cheng*, F.Supp.3d at 441–42 (same). Thus, the results in those cases can easily be reconciled with the result the Court reaches here.

grievance official did not tell Plaintiff he could obtain a form from any officer in the unit, but rather that the form would be mailed to him. *Id.* ¶ 13. Under these circumstances, Plaintiff was not required to make further requests that he was told would be unavailing and likely unwanted. Given the circumstances, a person of ordinary firmness would assume that he could not get a grievance form from anyone other than a grievance official, and that he would have to wait until such an official provided him a form before he could prosecute his administrative grievance. *See Scott v. Westchester County*, 434 F. Supp. 3d 188, 197–98 (S.D.N.Y. 2020) (finding that administrators thwarted a plaintiff's pursuit of administrative remedies where the plaintiff "repeatedly requested assistance writing a grievance but was either ignored or told someone would help him, and no one provided that help"); *see also Hayes*, 976 F.3d at 271 (stating that determining whether remedies were unavailable to a plaintiff is a "highly fact-specific inquir[y]").

Second, Plaintiff adequately pleads that the administrative remedies theoretically available to him in fact operated as a "simple dead end." *Ross*, 578 U.S. at 643. A remedy operates as a simple dead end where "officers [are] unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* The plaintiff must show in some way that pursuit of administrative remedies is futile because the jail's administrative process "precludes the 'possibility of some relief' or that 'no such potential exists.'" *Reynolds v. Grove*, 2023 WL 2601710, at *4 (S.D.N.Y. Mar. 22, 2023) (quoting *Ross*, 578 U.S. at 643); *see also Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corrs. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021) (calling the "dead end" prong a "futility argument"). Here, Plaintiff has plausibly shown that his pursuit of administrative remedies in the ERU was futile.

While "a full record may show otherwise, it would be premature to dismiss the Complaint at this stage, when it is 'possible that administrative remedies were rendered unavailable' to Plaintiff." *Wing*, 2019 WL 6732967, at *6 (alterations omitted) (quoting *Shaw v. Ortiz*, 2016 WL 7410722, at *5 (S.D.N.Y. Dec. 21, 2016)).  Insofar as the pleadings raise a factual dispute as to whether reasonable efforts were made, and whether those efforts and other factors sufficiently show that remedies were unavailable, those questions are properly resolved later in litigation.  *Id.* (collecting cases).

## II.    Deliberate Indifference

Plaintiff brings claims under 42 U.S.C. § 1983 against Defendants for unconstitutional conditions of confinement, alleging that officers acted with deliberate indifference to conditions that posed a substantial risk of serious harm.  Dkt. No. 54 at 8–15.  During the two incidents which serve as the basis for his claims, Plaintiff had not yet been convicted and was a pretrial detainee.[10]  Dkt No. 54 at 9.

Defendants argue that Plaintiff's claims of deliberate indifference brought against Defendants Cooke, Jean-Louis, Stanley, Davis, and Guzman should be dismissed for failure to state a claim for relief.  Dkt. No. 46 at 8–18.  Defendants specifically argue that Plaintiff has failed to adequately plead "failure to protect" claims against Cooke, Stanley, and Guzman for the incident on April 21, 2022, and against Cooke, Jean-Louis, and Davis for the incident on April 23, 2022.  *Id.*

### A.    General Principles

Section 1983 is not "itself a source of substantive rights, but a method for vindicating federal rights conferred by those parts of the U.S. Constitution and federal statutes that it

---

[10] Plaintiff does not plead the status of his incarceration in the TAC but cites to the New York County docket record indicating Plaintiff's guilty plea in May 2023.

describes." *Patsy v. Bd. of Regents of the State of Fla.*, 457 U.S. 496, 516 (1982).[11]  Rather, a

pretrial detainee's Section 1983 claims for unconstitutional conditions of confinement are

evaluated under the Due Process Clause of the Fourteenth Amendment.  *See Darnell v. Pineiro*,

849 F.3d 17, 29 (2d Cir. 2017).

Prison officials have a constitutional duty under the Fourteenth Amendment to

reasonably ensure a safe environment for an incarcerated person.  *See Farmer v. Brennan*, 511

U.S. 825, 832 (1994).  Encompassed within that duty is the responsibility "to protect prisoners

from violence at the hands of other prisoners."  *Id.*  A prison official violates that duty to protect

when he acts with "'deliberate indifference' to any objectively serious condition of

confinement."  *Darnell*, 849 F.3d at 32 (citation omitted).  A prison official may be held liable

"if he knows that inmates face a substantial risk of serious harm and disregards that risk by

failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  Failure to fulfill that

duty violates an incarcerated person's rights, whether or not an attack actually occurs upon the

incarcerated person and whether or not injuries from such an attack are severe.  *See Caswell v.

Uhler*, 2020 WL 1245123, at *3 (N.D.N.Y. Mar. 16, 2020) ("To hold otherwise might

incentivize prison officials to ignore an inmate's pleas for protection from impending assaults

since those officials would only be on the hook if the prisoner were actually attacked.").  At the

same time, "[n]ot . . . every injury suffered by one prisoner at the hands of another . . . translates

into constitutional liability for prison officials responsible for the victim's safety."  *Id.* at 834.

Thus, the fact that the plaintiff has been injured in an attack is not alone enough to establish that

the prison official violated his constitutional rights.  *See Blake v. Kelly*, 2014 WL 4230889, at *5

(S.D.N.Y. Aug. 26, 2014).  "[P]rison officials who actually knew of a substantial risk to inmate

---

[11] The PLRA also is "not a source of a prisoner's claim."  *Jones*, 549 U.S. at 212.

health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also McGriff v. Coughlin*, 640 F. Supp. 877, 880 (S.D.N.Y. 1986) ("The Constitution does not guarantee an assault-free prison environment; it promises only reasonable good faith protection."). This standard of ensuring "reasonable safety" incorporates "due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Farmer*, 511 U.S. at 845 (citation omitted).

Under the Due Process Clause of the Fourteenth Amendment, a claim alleging a prison official's violation of a constitutional duty implicates both the objective conditions which give rise to a substantial risk of serious harm to a plaintiff—an "objective prong"—and the defendant-official's awareness of that risk—a "mens rea prong." *Darnell*, 849 F.3d at 29. Additionally, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," meaning each claim must independently and directly connect the respective defendant to an alleged violation of Plaintiff's constitutional rights. *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013); *see Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020).

### 1.    Objective Prong

The focus of the first prong is the objective existence of a "substantial risk of serious harm." *Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997), *aff'd sub nom.*, *Heisler v. Rockland Cnty.*, 164 F.3d 618 (2d Cir. 1998) (finding prong one satisfied when officers failed to intercede to stop an ongoing attack by a prisoner who attacked the plaintiff, then left the cell, and upon returning attempted to stab the plaintiff). It is not sufficient that a plaintiff, following an incident of violence, suffered serious harm; instead, it is necessary that, prior to the violent incident, "the facts . . . show the risk of serious harm was substantial." *Lewis v. Siwicki*, 944

F.3d 427, 432 (2d Cir. 2019); *see also Randle v. Alexander*, 960 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ("[T]he focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.'" (quoting *Heisler*, 981 F. Supp. at 837)); *accord Little v. County of Nassau*, 708 F. Supp. 3d 252, 264 (E.D.N.Y. 2023) ("To accept that the mere occurrence of a serious harm satisfies the objective prong of a claim for failure to protect against an inmate attack would eschew determining whether 'the risk' of such an attack and resulting injuries 'was substantial.'" (quoting *Lewis*, 944 F.3d at 432).

A plaintiff may establish a substantial risk of serious harm where "there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." *Luckey v. Jonas*, 2019 WL 4194297, at *4 (S.D.N.Y. Sept. 4, 2019); *see also Scott*, 434 F. Supp. 3d at 198 (same); *Rennalls v. Alfredo*, 2015 WL 5730332, at *4 (S.D.N.Y. Sept. 30, 2015) (same). A plaintiff may also show evidence of a risk from a group of prisoners or from the prison conditions. "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. Thus, "a plaintiff may satisfy the objective element by showing either a substantial risk of harm from 'a specific assailant' or 'a more general risk of harm due to the conditions at the time of the attack.'" *Ataroua v. Tamir*, 2023 WL 2216139, at *3 (S.D.N.Y. Feb. 22, 2023) (quoting *Hurst v. Perez*, 2017 WL 187532, at *2 (S.D.N.Y. Jan. 13, 2017)). It is sufficient that the plaintiff show that "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison official in the past," regardless of whether that risk emanated from a single inmate or a group of inmates. *Id.* at 842 (internal citations omitted). For

22

example, a plaintiff may show "a history of prior inmate-on-inmate attacks similar to the one suffered by the plaintiff and that the measures [defendants] should have taken in response to such prior attacks would have prevented the attack on the plaintiff." *Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013); *see Little*, 708 F. Supp. 3d at 266. Likewise, the "existence of a policy" established by the correctional facility to mitigate a certain kind of serious harm may constitute an admission that there existed a substantial risk of serious harm to the plaintiff. *Walker v. Shaw*, 2010 WL 2541711, at *10 (S.D.N.Y. June 23, 2010); *see Plunkett v. City of New York*, 2011 WL 4000985, at *4 (S.D.N.Y. Sept. 2, 2011) ("The very fact that DOC has rules and procedures that are designed to keep members of rival gangs . . . apart means that a trier of fact might well conclude that housing a Crip in a Blood house posed a substantial risk of serious harm to the Crip.").[12]

Prison conditions can also give rise to a general risk. In *Walker v. Schult*, for example, the Second Circuit held that allegations that the prison "mix[ed] inmates" across "gang members, non-gang members, and men of different races" created "'insurmountable problems' including fights, friction, and violence" between inmates and gave rise to a "substantial risk of serious harm" where the inmates were crowded into cells that were "so crowded and noisy [that] the guards would not know when prisoners were fighting unless another prisoner alerted them." 717 F.3d 119, 122 (2d. Cir. 2013) (citation omitted).

A plaintiff may also plead that he faces a substantial risk of serious injury from incarcerated people of a certain identity or those belonging to a certain group, based on his own

---

[12] In this respect, the "objective prong" of the analysis may sometimes collapse into the "mens rea" prong, as facts such as the existence of a DOC policy regarding the separation of rival gangs would tend to support both the objective risk of substantial harm and the actual or constructive knowledge that DOC staff has of the danger posed by mixing rival gang members.

different identity or membership in a different group.  *See Farmer*, 511 U.S. at 843 (finding that

a transgender incarcerated plaintiff within a high-security prison "belong[ed] to an identifiable

group of prisoners who are frequently singled out for violent attack by other inmates"); *Manning*

*v. Griffin*, 2016 WL 1274588, at *7 (S.D.N.Y. Mar. 31, 2016) (collecting cases).  For example,

courts in this Circuit have repeatedly recognized that gang-affiliated inmates may face a

substantial risk of harm when they are housed in areas controlled by rival gangs.  *See Thawney v.*

*City of New York*, 2018 WL 4935844, at *4 (S.D.N.Y. 2018); *Greene v. Garcia*, 2013 WL

1455029, at *6 (S.D.N.Y. Mar. 26, 2013) (denying motion to dismiss Section 1983 claim where

inmate alleged that prison officials placed him into rival gang's housing area); *Plunkett*, 2011

WL 4000985, at *4 (holding that trier of fact could conclude that housing one gang member in

rival gang's unit posed a substantial risk of serious harm to inmate); *Shaw*, 2010 WL 2541711, at

*8 (noting that plaintiff could state a deliberate indifference claim "if he alleged that identified,

responsible prison officials failed to promptly relocate him from the Crips cell block after he was

classified as a Blood").

## 2.    Mens Rea Prong

The second prong, or the "mens rea prong," requires a plaintiff to plead that the

defendant-official knew or should have known that the alleged conditions posed a substantial

risk of serious harm to the plaintiff and then subsequently acted with deliberate indifference to

those conditions.  *Darnell*, 849 F.3d at 29.  While the mens rea prong is sometimes called the

"subjective prong," deliberate indifference under the Due Process Clause is "defined

objectively"—a pretrial detainee may satisfy their burden by showing either that the defendant-

official "acted intentionally to impose the alleged condition," or that the official "recklessly

failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial

detainee even though [defendant] knew, or should have known, that the condition posed an

excessive risk to health and safety." *Id.* at 35 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 392 (2015)).[13]  Therefore, the incarcerated plaintiff need not show that the defendant-official was subjectively aware of the "harmfulness associated with the conditions."  *Megginson v. City of New York*, 2025 WL 902644, at *11 (S.D.N.Y. Mar. 25, 2025) (quoting *Singleton v. City of New York*, 2022 WL 4620174, at *5 (S.D.N.Y. Sept. 30, 2022)).

### B.    Application

Plaintiff alleges deliberate indifference on the part of Cooke, Stanley, and Guzman for the incident on April 21, 2022, and on the part of Cooke, Jean-Louis, and Davis for the incident on April 23, 2022.  Plaintiff adequately pleads a claim with respect to some of the Defendants but not with respect to all.

### 1.    April 21, 2022

Plaintiff alleges that Cooke, Stanley, and Guzman all exhibited deliberate indifference to his personal safety in connection with his placement in a cell in 3 Main, the housing unit predominated by the Los Trinitarios gang.  TAC ¶¶ 17–36; Dkt. No. 54 at 9.  Plaintiff alleges that Cooke placed him in 3 Main notwithstanding Plaintiff's warnings that the members of Los Trinitarios who resided there did not like Black people.  Specifically in response to his request to be placed elsewhere, Cooke stated: "[Y]ou know how to fight, right?"  TAC ¶ 23.  Stanley then escorted Plaintiff to the 3 Main housing unit and, even after the inmates housed in that unit began

---

[13] Whereas analysis under the "objective prong" for Section 1983 deliberate indifference claims is effectively the same under the Fourteenth and Eighth Amendments, the Supreme Court has construed the "mens rea prong" for deliberate indifference under the Cruel and Unusual Punishments Clause of the Eighth Amendment as a purely subjective standard.  *See Farmer*, 511 at 826 ("The Eighth Amendment outlaws cruel and unusual 'punishments,' not 'conditions,' and the failure to alleviate a significant risk that an official should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment under the Court's cases . . . .  [Adoption] of a purely objective test for determining liability—whether the risk is known or should have been known—is rejected.").

to yell that Plaintiff was not wanted because he was not a member of Los Trinitarios and did not speak Spanish, insisted that Plaintiff step inside the unit. *Id.* ¶¶ 26–27. Guzman was responsible for monitoring the floor of 3 Main and intervening if any fights broke out. *Id.* ¶ 32. After Plaintiff entered the unit, the other inmates asked him if he spoke Spanish and whether he was in the gang and then began to assault him. *Id.* ¶¶ 29, 31. Instead of intervening when the assault began, Guzman turned the other direction and walked away. *Id.* ¶ 33. It was not until five minutes later, after the panic button was pressed and the emergency unit arrived, that the assault ended. *Id.* ¶ 34.

Plaintiff pleads sufficient facts to establish a substantial risk of serious harm in connection with his placement in 3 Main. Crediting Plaintiff's allegations and construing them liberally, Plaintiff alleges that (1) he informed Cooke that he would be at risk if placed in 3 Main and the specific reasons he would be at risk—*i.e.*, it was home to a Spanish-speaking gang, the gang did not like Black people, and Plaintiff was Black and did not speak Spanish, *id.* ¶¶ 23–23; (2) Cooke did not deny the assertion that Plaintiff would be at risk in 3 Main but rather acknowledged its truth by asking Plaintiff if he knew how to fight, *id.* ¶ 23; (3) the inmates housed in 3 Main immediately began to yell when Plaintiff reached the dormitory entrance that he was not welcome because he was not a member of Los Trinitarios and did not speak Spanish, *id.* ¶ 27; and (4) Plaintiff, in fact, suffered serious injuries from a prolonged attack as soon as he was placed in 3 Main, *id.* ¶¶ 31, 37. Plaintiff also pleads that all Rikers personnel were aware that certain dorms were associated with particular gangs. *Id.* ¶ 42.

Each of those alleged facts, viewed in isolation, would not be sufficient to establish a substantial risk of serious injury. First, a prisoner's conclusory assertion—made either to a corrections officer or in a complaint—that he would face a risk of serious injury if placed in a

particular unit does not give rise to a plausible inference that there existed a substantial risk of serious injury.  *See Chalif v Spitzer*, 2008 WL 1848650, at *9 (N.D.N.Y. Apr. 23, 2008); *Bolton v. Goord*, 992 F. Supp. 604, 627 (S.D.N.Y. 1998) (subjective fear of assault does not give rise to a constitutional claim in the absence of evidence that the fear was well-founded).  Corrections officials charged with the protection of all persons incarcerated in a particular facility necessarily have some discretion regarding the placement of individual incarcerated persons.  The naked assertion by a prisoner that he would face a risk if placed in a particular unit, if unaccompanied by any evidence of prior attacks or credible threats of attacks, is not enough to curtail that exercise of discretion or to place a heightened duty on a correctional officer.  *See McMahon v. Fisher*, 446 F. App'x. 354, 357 (2d Cir. 2011) (summary order) ("A prisoner has no right to housing in a particular facility and no right to process regarding a transfer to another facility under these circumstances."); *see also Hasan Jamal Abdul Majid v. Henderson*, 533 F. Supp. 1257, 1271 (N.D.N.Y. 1982) (stating correctional officers have broad discretion to transfer an incarcerated person), *aff'd*, 714 F.2d 115 (2d Cir. 1982).

Second, as to Cooke's statements, a "substantial risk of serious harm[] depends not on the officials' perception of the risk of harm, but solely on whether the facts . . . show that the risk of serious harm was substantial."  *Lewis*, 944 F.3d at 431.   Thus, while Cooke's statement is relevant to whether there existed a substantial risk of serious harm, her perception of risk could not alone show that such risk was substantial.

Third, vaguely hostile verbal statements from other inmates do not suffice to establish a substantial risk of serious harm.  *See Hines v. Lacy*, 189 F.3d 460, *3 (2d Cir. 1999) (unpublished order) ("[Plaintiff's] sketchy description of a verbal confrontation does not sufficiently allege 'conditions posing a substantial risk of serious harm'"); *Desulma v. City of*

*N.Y.*, 2001 WL 798002, at *7 (S.D.N.Y. July 6, 2001) ("[T]he inmates told him he was 'going to pay a price' and told him to get away from them because 'he smell[ed].' These verbal statements alone do not indicate a substantial threat of serious harm." (citation omitted)).

And fourth, the post-hoc fact of an attack does not itself establish that the risk of the attack was substantial. *See Blake*, 2014 WL 4230889, at *5 (quoting *Heisler*, 981 F. Supp. at 837).

Plaintiff's allegations, however, are not to be read in isolation but in their totality. *See Bernstein v. Cengage Learning, Inc.*, 2021 WL 4441509, at *4 (S.D.N.Y. Sept. 28, 2021) ("At the pleading stage, all factual allegations in the complaint must be viewed in their totality."); *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, 2014 WL 2600133, at *4 (S.D.N.Y. June 10, 2014) ("[P]lausibility is determined based on the totality of the allegations in the operative complaint."). So read, each of the allegations supports the others and together establish a plausible claim that placing Plaintiff, a Black man who did not speak Spanish, with the Los Trinitarios would subject Plaintiff to a substantial risk of serious injury.

In particular, Cooke's response to Plaintiff's expression of concern that he would be at risk if placed with Los Trinitarios can be taken as an adoptive admission by Cooke, in her position of authority as a warden in the institution, that Plaintiff's concern was well-founded and that, far from being protected in the unit, Plaintiff would have to fight if he wished to avoid serious injury. *See Caswell*, 2020 WL 1245123, at *4; *cf. Knowles v. N.Y.C. Dep't of Corr.*, 904 F. Supp. 217, 119, 221 (S.D.N.Y. 1995) (considering objective prong to be met where plaintiff's face was slashed with a sharp instrument and plaintiff was told by a corrections officer that the injury was "the result of a 'war' between Spanish and Jamaican inmates in another part of the facility"). Cooke could have disputed Plaintiff's concerns if she believed them to be mistaken;

that she did not do so but instead affirmed them helps support the plausible inference that Cooke shared in the institutional knowledge that Plaintiff as a Black man would be at serious risk if incarcerated with members of the Los Trinitarios.  *See* Fed. R. Evid. 801(d)(2)(B) (setting forth hearsay exclusion for statements that opposing party "manifested that it adopted or believed to be true"); *United States v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980) ("[A] person ordinarily will respond to an incriminatory or defamatory statement with a denial, or at least with some indication that he objects to the statement as untrue."); *cf. Walker v. Shaw*, 2010 WL 2541711, at *10 (considering existence of a policy of keeping certain classes of inmates separate as evidence of the objective risk of serious harm from mixing those groups); *Plunkett*, 2011 WL 4000985, at *4 (same).

As plead, the actions of the 3 Main inmates when confronted with the possibility that Plaintiff would be placed with them further corroborate Plaintiff's concern that he would be at risk if he were housed with members of Los Trinitarios.  They began yelling that Plaintiff was not welcome because he was Black and because he did not speak Spanish—exactly the concerns that Plaintiff expressed to Cooke and that Cooke by her response could be deemed to have acknowledged.  *See Lewis*, 944 F.3d at 432 (finding an objective risk of serious harm where defendant-officials intercepted a threat against plaintiff, informed plaintiff that a member of a specific gang was likely to assault him, and such an assault did eventually occur).

Finally, the fact that Plaintiff suffered serious injuries as a result of an "undisputably unprovoked attack" itself corroborates that the threats Plaintiff faced were real and not imaginary.  *See Gordon v. Drummond*, 2021 WL 5314604, at *7 (S.D.N.Y. Nov. 16, 2021), *report and recommendation adopted*, 2022 WL 884971 (S.D.N.Y. Mar. 25, 2022).[14]  Plaintiff

---

[14]  The *Gordon* court suggested that sufficiently serious injuries as a result of an undisputedly

has therefore adequately plead that his placement in 3 Main subjected him to a serious risk of

substantial injury.

Plaintiff has likewise sufficiently plead knowledge on the part of Cooke to meet the mens

rea requirement. As set forth above, Cooke's response to Plaintiff's concerns about being placed

in 3 Main may be deemed an adoptive admission by Cooke that Plaintiff was being placed in

danger. *See Caswell*, 2020 WL 1245123, at \*4 (finding the mens rea prong met where

homosexual plaintiff requested that he not be housed with a bunkmate known to be hostile

toward homosexuals, and defendant-official responded that plaintiff should "save the semen" if

he were ever sexually assaulted by his bunkmate before assigning him to a cell with an "alleged

rapist"); *cf.* Farmer, 511 U.S. at 848 (construing as evidence of defendant-officials' subjective

awareness of risk faced by transgender inmate a statement by the warden to the plaintiff that

there was "a high probability that [plaintiff] could not safely function at [the prison]").

Plaintiff has not plead sufficient facts to satisfy the mens rea prong with respect to

Stanley. Stanley is not alleged to have been present when Plaintiff told Cooke that he was afraid

to be housed with members of Los Trinitarios. She also was not present when Cooke effectively

affirmed the reasonableness of Plaintiff's concerns and informed Plaintiff that he might have to

fight. The only notice Stanley allegedly received that Plaintiff might have been at risk of

physical danger was the inmates' shouts that Plaintiff "was not welcome [in 3 Main] because he

was not a member [of] Los Trinitarios and because he did not speak Spanish." TAC ¶¶ 26–27.

That fact does not establish that Stanley acted recklessly with respect to Plaintiff's safety,

*i.e.*, that she knew or should have known that Plaintiff was at substantial risk of serious harm but

unprovoked attack can alone satisfy the objective prong of the *Farmer* test. The Court need not
go that far to hold that Plaintiff has alleged sufficient facts here to permit a plausible inference
that housing him with members of Los Trinitarios placed him at substantial risk of serious injury.

failed to act with reasonable care in mitigating that risk.  *See Darnell*, 849 F.3d at 35.  At most, based on the facts as alleged, Stanley was negligent in not barring Plaintiff's transfer, which does not give rise to a constitutional claim.  *See Dennis*, 485 F. App'x. at 481 (holding that a hostile statement by soon-to-be-assailant targeted at plaintiff, overheard by two correctional officers, was not enough to put either officer on notice of a substantial risk of harm, and citing cases to that effect); *see also Garcia v. Rodriguez*, 2007 WL 2456631, at *2 (S.D.N.Y. Aug. 24, 2007) ("[T]he Court cannot agree . . . that [fellow inmate's] isolated statement that [plaintiff] would 'get hurt,' which was unaccompanied by any other words or actions or prior history between [fellow inmate] and [plaintiff], was sufficient to put [the defendant-official], or any reasonable officer in his position, on notice that [plaintiff] faced a substantial risk of serious harm or that it was anything more than an idle threat.").  Without allegations of more specific threats made to Plaintiff by residents of 3 Main in front of Stanley—or other allegations regarding Stanley's potential awareness of the substantial risk of serious harm that Plaintiff objectively faced in 3 Main—Plaintiff does not plausibly allege actual awareness from Stanley.  Nor does Plaintiff allege constructive knowledge.  He does not, for instance, plead that the threat posed by Los Trinitarios to similarly situated individuals was a matter of general knowledge among the AMKC personnel.

Plaintiff has, however, stated a claim based on Guzman's failure to intervene to protect Plaintiff on April 21, 2022.  "A correctional officer's failure to intervene during an inmate attack can constitute deliberate indifference."  *Blake v. Israel Sexton, Sergeant, N.Y.C. Police Dep't*, 2016 WL 1241525, at *3 (S.D.N.Y. Mar. 24, 2016) (citing *Morales v. N.Y. State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988)).  "The standard applied . . . to the claims for deliberate indifference in failing to protect against (i.e., prevent) [an] attack likewise applies to the claims

31

for deliberate indifference in failing to intervene in the attack once it commenced." *Little*, 708 F. Supp. 3d at 269. A serious attack, once it commences, satisfies "the objective prong of the failure to intervene analysis." *Id.*; *see Rosen v. City of New York*, 667 F. Supp. 2d 355, 360 (S.D.N.Y. 2009) (holding that objective prong is satisfied when the officer "observed or had reason to know that the Plaintiff was involved in a physical altercation with another inmate"). The subjective prong is satisfied when the officer "has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Little*, 708 F. Supp. 3d at 269 (quoting *Leckie v. City of New York*, 2021 WL 84234, at *5 (E.D.N.Y. Jan. 11, 2021)); *see Stubbs v. Dudley*, 849 F.2d 83, 86–87 (2d Cir. 1988) (holding that subjective prong is satisfied when an officer "without plausible justification, displayed deliberate indifference in failing to prevent [a] beating . . . despite having had the opportunity to do so," including where there was evidence that the officer "had adequate time to assess the serious threat facing [the plaintiff] and a fair opportunity to afford him protection at no risk to himself or the security of the prison" but refused to do so); *Thawney*, 2018 WL 4935844, at *4 ("It is well established that an officer acts with deliberate indifference if he is aware of an attack, has an opportunity to protect the inmate, and does not intervene."); *Rosen*, 667 F. Supp. 2d at 360 (explaining that an officer displays deliberate indifference when he or she "has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene" (citation omitted)).

Plaintiff pleads sufficient facts to establish a deliberate indifference claim based on Guzman's failure to intervene. Plaintiff alleges that, after seeing other inmates of 3 Main assault Plaintiff, Guzman "turned the other direction and walked away," despite being the officer on the floor at the time, which meant that Guzman was directly responsible for "intervening to stop any

fights that broke out." TAC ¶¶ 32–33.  A substantial risk of serious injury existed because

Plaintiff was being violently assaulted by a group of inmates.  Based on the complaint's

allegations, Guzman exhibited deliberate indifference because he was aware of the attack and

could have intervened without any risk to his safety or that of the institution yet failed to do so.

Indeed, Defendants themselves concede in their memorandum of law in support of their motion

to dismiss that "Officer Guzman's involvement [alleged by Plaintiff] on the [sic] April 21, 2022,

certainly raises questions of fact such as turning away from [Plaintiff] and the length of time that

prevent dismissal at this time on these grounds."  Dkt. No. 46 at 12 n. 4; *see Wheeler v. Harper*,

2022 WL 769208, at *4 (S.D.N.Y. Mar. 14, 2022) (finding sufficient culpable intent for the

defendant-official where "there is evidence that 'officers witnessed [an] assault, but failed to

intercede to stop it'" (quoting *Blake v. Kelly*, 2014 WL 4230889, at *5 (S.D.N.Y. Aug. 26,

2014), *rev'd on other grounds*, *Darnell*, 849 F.3d at 29)).

### 2.     April 23, 2022

Plaintiff received stitches and medical treatment at Bellevue for the injuries he suffered

from the incident on April 21, 2022.  TAC ¶ 37.  Upon his return, Plaintiff declined an offer to

be placed in the IPC and was placed in Quad 4 Upper, a unit occupied by members of the Mac

Ballers Gang.  *Id.* ¶¶ 41, 44–45.  In that unit, on April 23, 2022, he was assaulted by the other

inmates and suffered bruising, swelling, and lacerations.  *Id.* ¶¶ 53, 60.  Plaintiff alleges that

Cooke and corrections officers Jean-Louis and Davis exhibited deliberate indifference to his

safety in connection with his placement in Quad 4 Upper and in connection with the incident on

April 23, 2022.  Dkt. No. 54 at 14–15.  Plaintiff does not plead a constitutional violation as to

Cooke and Jean-Louis but adequately pleads a violation as to Davis for failure to intervene.

Plaintiff has not pleaded facts adequate to show a substantial risk of serious injury in

connection with Plaintiff's placement in Quad 4 Upper.  He alleges that Quad 4 Upper was a

Mac Baller housing unit and that all jail staff, including Cooke, would know which gang affiliation existed in each dorm. *Id.* ¶¶ 42, 45. But he has not alleged any facts regarding the risk of violence presented by members of the Mac Baller gang to those unaffiliated with their gang, nor whether there was any institutional history that would demonstrate that persons similarly situated to Plaintiff were at risk from the Mac Ballers. Plaintiff states that he "specifically sought to avoid gang housing" because he "feared further attacks." Dkt. No. 54 at 13–14. But he does not allege sufficient objective facts supporting that fear.

Plaintiff argues that his "known vulnerability" as a result of the attacks in 3 Main, when combined with the "obvious power dynamic" of being "an outsider in a unit dominated by a hostile gang," manifested a substantial risk of serious harm during his transfer to the Quad 4 Upper. *Id.* at 15. He argues that his concerns were not vague or generalized because he had "already been attacked just two days earlier in another gang-dominated unit," and the "specific and immediate risk" posed by his placement in Quad 4 Upper therefore meets the objective prong for deliberate indifference. Dkt. No. 54 at 13–14. But that argument amounts to the claim that a prisoner, once attacked by members of one gang, will be at substantial risk of future serious attack by members of a different gang. Without more facts alleged, the Court cannot simply infer from the fact that Plaintiff was the victim of an attack by one gang that he was at serious risk of attack by another gang. *See Little*, 708 F. Supp. 3d at 266–67. For both incidents, Plaintiff pleads no facts regarding the relationship between the two gangs or any history of violent attacks upon non-gang members by members of gangs generally, such that there would be a substantial risk of serious harm to Plaintiff merely by putting him in a unit where members of the Mac Ballers, or any gang for that matter, resided.

Moreover, even if an objective condition of constitutional deprivation were present in

Plaintiff's transfer to Quad 4 Upper, Plaintiff has not alleged sufficient facts to show that Jean-Louis knew or should have known about that objective condition, or that Jean-Louis recklessly disregarded that condition.[15]  All that is alleged as to Jean-Louis is that Quad 4 Upper residents stated that "Plaintiff 'ain't coming in here'" because Quad 4 Upper "is a Mac Baller house." TAC ¶ 47.  Plaintiff does not allege that the residents of Quad 4 Upper threatened him with harm in the presence of Jean-Louis.  He also does not allege that Jean-Louis was present when the assault began, or that other facts existed or were known to Jean-Louis that would give rise to a claim for deliberate indifference.  *See Rosen*, 667 F. Supp. 2d at 358 (denying motion for summary judgment on deliberate indifference claim where dispute of fact remained as to whether the correctional officer "had an unobstructed view of the fight" but did not intervene for at least five minutes during the alleged assault).  Without more, the statements by inmates in Quad 4 Upper that they did not want Plaintiff in their unit because he was not a Mac Baller do not themselves put a correctional officer like Jean-Louis on notice of a substantial risk of serious harm to Plaintiff.  From the facts alleged and from the perspective of the officer before the assault began, there is an insufficient basis for concluding that the threats were real or serious. *See Dennis*, 485 F. App'x. at 481.

Plaintiff's allegations that Jean-Louis turned off the lights in Quad 4 Upper and failed to turn them back on also fail to make out a constitutional claim.[16]  Dkt. No. 54 at 15 (citing

---

[15] In his memorandum of law in opposition to the motion to dismiss, Plaintiff makes arguments based on facts that simply cannot be drawn from the TAC as pled, even granting the solicitude owed to *pro se* plaintiffs.  For example, the brief states that Jean-Louis should have been aware of the risk to Plaintiff from his transfer to Quad 4 Upper because Plaintiff "repeatedly voiced concerns about gang violence," but the TAC does not allege that Plaintiff voiced those concerns to Jean-Louis.  Dkt. No. 54 at 15.

[16] Plaintiff does not explicitly allege that Jean-Louis turned off the lights—rather, he states that the lights turned off on the floor soon after Plaintiff arrived to the floor; that only "COs and staff" had control over the lights; that he saw Jean-Louis escorting another resident of Quad 4

*Darnell*, 849 F.3d at 35).  It is not alleged that he knew or recklessly disregarded the possibility that an attack would ensue once the lights were turned off or was aware or should have been aware of the attack that did ensue.

Plaintiff does plead a deliberate indifference claim based on a failure to intervene by Davis.  Plaintiff alleges that Davis was responsible for intervening in any fights that broke out in Quad 4 Upper, that he observed the attack on Plaintiff, and that he had the opportunity to safely stop it, but that he failed to do so.  TAC ¶¶ 46, 53, 55–57.  Indeed, Plaintiff goes so far as to allege that Davis, noting that Plaintiff was at risk from the other inmates who had previously made a threat to Plaintiff, attempted to push him back into the arms of his assailants.  *Id.* ¶¶ 47, 55.  It may be that, as Defendants assert, Davis intervened as soon as he arrived and that he made efforts to protect Plaintiff, or that Defendant Davis was simply slow to respond to a sudden attack on Plaintiff, but discerning the truth of those representations requires discovery.  *See Twombly*, 556 U.S. at 678 (complaint need only allege possibility and not probability that defendant has acted unlawfully); *Mayor & City Couns. of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (reasonable inferences must be drawn in favor of plaintiff at motion to dismiss stage).  They cannot be resolved adversely to Plaintiff on a motion to dismiss.

## III.   Qualified Immunity

Defendants argue that Davis is entitled to qualified immunity from Plaintiff's deliberate indifference claims.[17]

---

Upper shortly beforehand; and that Jean-Louis was penalized shortly thereafter for allowing the lights to turn off.  *See* TAC ¶¶ 51, 52.  But, from those facts, the Court may infer that Jean-Louis was the one to turn off the lights.  Dkt. No. 54 at 15.

[17] Because Plaintiff fails to state a claim for relief against Defendant Jean-Louis, the Court does not consider Defendants' argument for qualified immunity with respect to Jean-Louis.

Qualified immunity "shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Walker*, 45 F.4th at 617. A defendant-official is entitled to qualified immunity on a Rule 12(b)(6) motion to dismiss if the allegations of the complaint "fail to 'state a claim of violation of clearly established law.'" *Connell v. Signoracci*, 153 F.3d 74 (2d Cir. 1998) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)). Plaintiff need not cite a case "directly on point." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). A right is "clearly established when 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . . The unlawfulness must be apparent.'" *Connell*, 153 F.3d at 80 (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[D]efendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Varrone v. Fitzgerald*, 123 F.3d 75, 78 (2d Cir. 1997) (citing *Harlow*, 457 U.S. at 815).

A qualified immunity defense presented on a Rule 12(b)(6) motion "faces a formidable hurdle . . . and is usually not successful." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006); *see Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983) ("Usually, the defense of qualified immunity cannot support the grant of a Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim upon which relief can be granted."); *see also Chamberlain Est. of Chamberlain*, 960 F.3d 100, 111 (2d Cir. 2020) (per curiam) ("[A]dvancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch."). While "qualified immunity should be resolved 'at the earliest possible stage in litigation,'" the immunity question

also cannot be resolved "*before* the 'earliest possible stage,' i.e., prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised." *Chamberlain*, 960 F.3d at 111 (emphasis in original) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Otherwise, plaintiffs alleging a violation of their constitutional rights would face a heightened pleading standard under which they must plead not only facts sufficient to make out their claim but also additional facts to defeat an assertion of qualified immunity." *Id.* at 111 (citing *Castro v. United* States, 34 F.3d 106, 111 (2d Cir. 1994)). Therefore, as with "all 12(b)(6) motions," a defendant presenting an immunity defense at this stage "must accept the more stringent standard applicable to this procedural route," which entitles plaintiff to "all reasonable inferences from the facts alleged, not only [for] those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

Plaintiff alleges that Davis violated Plaintiff's clearly established constitutional right to reasonable safety by failing to protect him from harm from his incarcerated attackers in Quad 4 Upper. TAC ¶¶ 54–57; Dkt. No. 54 at 17–18; *see Rosen*, 667 F. Supp. 2d at 362. Defendants argue that the pleadings on their face show that Davis attempted to end the assault on Plaintiff in Quad 4 Upper by using pepper spray.[18] Dkt. No. 46 at 19–20; Dkt. No. 55 at 8–9. However, drawing all reasonable inferences in the Plaintiff's favor, Davis had an opportunity to protect Plaintiff but instead chose not to do so, putting him at risk from his attackers by repelling

---

[18] Defendants also argue that Davis is entitled to qualified immunity because it was not objectively unreasonable for Davis to utilize pepper spray to end the assault in Quad 4 Upper and to spray Plaintiff in the process, even if it caused injury to Plaintiff. Dkt. No. 46 at 29 (citing to cases deciding whether incarcerated bystander plaintiffs had rights to relief from injuries resulting from officer intervention in a fight by chemical spray). But that argument construes the facts favorably to Defendants and not to Plaintiff, and rests on the notion that Plaintiff's complaint concerns the pepper spray itself. To the contrary, Plaintiff alleges that Davis failed to protect Plaintiff from the violence of other inmates. *See* TAC ¶ 53–57; Dkt. No. 54 at 17–18.

Plaintiff from the relative safety of the front of the unit.  Accordingly, the case will have to await factual development before the Court can make "a determination of reasonableness."  *Rosen*, 667 F. Supp. 2d at 362 (citing *Thomas v. Roach*, 165 F.3d 137, 143–45 (2d Cir. 1999)).

## IV.   Leave to Amend

Defendants argue that Plaintiff should not be granted leave to further amend his complaint.  Dkt. No. 46 at 21.  The Court disagrees—justice requires that Plaintiff be allowed to amend his complaint, this time with the benefit of counsel.

A court "should freely give leave" to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "As the Second Circuit has stated, '[a] *pro se* complaint should not be dismissed without the Court's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be started.'"  *Cagle v. Weill Cornell Med.*, 680 F. Supp. 3d 428, 439 (S.D.N.Y. 2023) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013)); *see also Rettino v. N.Y.C. Dep't of Educ.*, 2020 WL 4735299, at *6 (S.D.N.Y Aug. 14, 2020) ("A court should grant a *pro se* plaintiff leave to replead his claims when it cannot 'rule out any possibility, however unlikely it may be, that an amended complaint would succeed in stating a claim.'" (quoting *Cruz v. Gomez*, 202 F.3d 593, 597–98 (2d Cir. 2000))).  "[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (citations omitted).

Defendants argue that Plaintiff has "made multiple attempts" to amend his complaint and allowing Plaintiff more attempts would be futile.  *See United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (stating that leave to amend should generally be denied in instances of futility or repeated failure to cure deficiencies by amendments previously allowed).

However, the Court has reason to believe that amendment would not be futile here. Plaintiff may be able to plead additional facts that would allow his complaint to survive against one or more of the dismissed Defendants. And it is somewhat misleading to fault Plaintiff for the number of his prior pleadings. As a self-represented litigant, Plaintiff initially named persons as defendants who were not proper defendants, *see* Dkt. No. 5, and was later granted leave to file an amended complaint identifying by name the persons previously sued as John Does, *see* Dkt. No. 21. While Plaintiff "drafted all his prior pleadings *pro se* while incarcerated, without benefit of counsel or full access to legal materials," Plaintiff now has counsel. Dkt. No. 54 at 18. Allowing Plaintiff leave to file a further amended complaint would give him an opportunity to replead his claims with the full benefit of counsel. *See Pflaum v. Town of Stuyvesant*, 937 F. Supp. 2d 289, 310 (N.D.N.Y. 2013) (granting leave to plaintiff to file a formal motion to amend "in an exercise of extreme caution" where the plaintiff obtained counsel after defendants filed their motion to dismiss). Denying leave to amend now without giving Plaintiff the opportunity to cure the above identified deficiencies, especially after Plaintiff has only just obtained counsel, would not serve the interests of justice. *See Kopchik v. Town of E. Fishkill, N.Y.*, 759 F. App'x 31, 38 (2d Cir. 2018) (summary order); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189–90 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").

**CONCLUSION**

Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff is given leave to file an amended complaint by no later than November 17, 2025.

The Clerk of Court is respectfully directed to close Dkt. No. 44.


SO ORDERED.


Dated: September 15, 2025
       New York, New York

_____
LEWIS J. LIMAN
United States District Judge

41